UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JOEL HJORTNESS, a minor,
by and through his parents and legal guardians,
Eric and Gail Hjortness,

        Plaintiffs,

   v.                                                                             Case No. 05-C-0648

NEENAH JOINT SCHOOL DISTRICT,

        Defendant.

---

NEENAH JOINT SCHOOL DISTRICT,

        Plaintiff,

   v.                                                                  Case No. 05-C-0656

JOEL HJORTNESS, a minor,
by and through his parents and legal guardians,
Eric and Gail Hjortness,

        Defendants.

---

**DECISION AND ORDER**

---

      In this consolidated action, both parties seek judicial review of the May 6, 2005, decision of Administrative Law Judge William S. Coleman, Jr., of the Wisconsin Department of Hearings and Appeals following a due process hearing under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1401 *et seq.* Following an extensive hearing and briefing by the parties, ALJ Coleman found that, although the individualized education plan offered by the School District

was substantively appropriate, the School District had violated the Parents' procedural rights under the IDEA. Based on this finding, the ALJ ordered the District to reimburse the Parents $26,788.32 of the more than $100,000 they had sought toward the cost of placing their son at a private school in Chicago. In their action for judicial review, the Parents claim that the ALJ erred in failing to award them the full cost of private school placement, as well as related travel expenses they incurred and attorney's fees. The District, on the other hand, challenges the ALJ's finding that it violated the Parents' procedural rights and claims they are entitled to no relief whatsoever. The case is presently before the court on the Parents' motion for judgment on the administrative record and the District's motion for summary judgment. For the reasons stated below, the Parents' motion will be denied and the District's motion will be granted.

## BACKGROUND

Joel Hjortness, who was born on XX-XX-XXXX, is an exceptionally bright student with an IQ of 140. (IEP Meeting, Disc #1, Track 18.) However, he has disabilities that manifest themselves in a wide range of problem behaviors that interfere with his learning and the learning of others. At various times, he has been diagnosed with obsessive compulsive disorder, Tourette's disorder, attention deficit/hyperactivity disorder, autistic spectrum disorder, oppositional defiant disorder, and anxiety disorder. (Decision of Administrative Law Judge William J. Coleman, Jr., dated May 6, 2005 ¶ 3.) In August 2003, an examining psychiatrist described him as "a child with a complex neuropsychiatric disturbance that compromises his ability to self regulate his attention and concentration, suppress irrelevant perseverance ideation and to defuse and divert antisocial/inappropriate impulses." (*Id.*) A teacher who was involved with Joel during the latter

half of 2003 described him as having "significant deficits in the area of social communication." (*Id.*)

Joel and his parents reside in the area served by the Neenah Joint School District. Until May 2003, Joel attended public schools in the District. Joel was in the seventh grade during the 2002-2003 school year. He maintained a grade point average of 3.5 as a regular education student at the Shattuck Middle School and was on the honor roll for the three quarters he completed. (Decision ¶ 2.) However, in May 2003, Joel's parents withdrew him from Shattuck because they believed the District was not adequately addressing Joel's behaviors that were manifestations of his disabilities. His parents thereafter enrolled him in the Kennan Academy in the Menasha area until January 2004, when they enrolled him as a residential student at the Sonia Shankman Orthogenic School (SSOS) in Chicago, Illinois. (Decision ¶ 1.) SSOS is a coeducational residential treatment program for children in need of support for behavioral and emotional issues. Its academic program employs small class sizes taught by certified special education teachers. Students live in dormitories in groups of up to seven students, in which at least one counselor is present at all times.[1] (Decision ¶ 10.)

On November 13, 2003, the District offered to complete a three-year reevaluation of Joel as required by law. (Decision ¶ 5.) An initial meeting to discuss testing to be used in the evaluation was set for January 14, 2004, but was postponed at the Parents' request so that personnel from SSOS could be present. Ultimately, however, it appeared SSOS representatives were unable to be present and instead District personnel visited SSOS. On March 12, 2004, a school psychologist,

---

[1] It appears, however, that SSOS also offers day programs to some students. (Docket #13 at 129.)

3

Case 1:05-cv-00656-WCG    Filed 06/27/06    Page 3 of 18    Document 9

an occupational therapist, and an autism resource teacher from the District visited SSOS to observe Joel and to interview staff who had worked with him. (*Id.* ¶¶ 11-13.) At a March 19, 2004, Multi-Disciplinary meeting, based in part on this observation, as well as the results of other tests that had been preformed, the reevaluation team concluded the Joel met the special education criteria for autism and other health impairment (OHI). (*Id.* ¶ 15.) The team also concluded that Joel met the educational criteria for emotional behavioral disability (EBD). (*Id.* ¶ 16.) However, because of the Parents' objections, the District chose not to identify EBD as an additional disability.

Having reevaluated Joel, the District was next tasked with developing an individualized education plan (IEP) for him. The IEP team meeting convened on April 22, 2004. The team included the District's special education director, one regular education teacher each from Neenah High School and Shattuck Middle School, one special education teacher each from those same schools, an OHI consultant, and the three district staff members who had visited SSOS. (Decision ¶ 21.) Joel's mother attended the meeting with her attorney. After discussing Joel's strengths and weaknesses, the parties proceeded to discuss, in general terms, goals and short-term objectives for Joel's education. While the parties did identify one specific goal–namely, that Joel would raise his hand at least 50% of the time when appropriate–no other specific goals or short-term objectives were identified at the IEP team meeting. (*Id.* ¶ 24-25.) All the participants agreed that Joel needed instruction at a small group setting; however, the District declined to specify how many students "small" entailed, despite Joel's mother's request for clarification. (*Id.* ¶¶ 27-28.) Joel's mother also indicated that she believed Joel needed extended school year (ESY) services to avoid regression in his social skills. The District did not consider such services for the summer of 2004, but indicated

4

a willingness to revisit the issue upon receiving additional baseline information about Joel from SSOS. (*Id.* ¶ 30.)

After the IEP meeting, District staff who were members of the IEP team prepared the IEP for the period May 17, 2004, through May 16, 2005. The IEP specified four goals. Only the first of these–use of appropriate hand raising procedures 50% of the time–had been specifically addressed at the IEP meeting. (Decision ¶ 33.) The short-term objectives in support of these goals were, for the most part, derived from Joel's previous IEP and were not discussed at the IEP meeting. (*Id.* ¶ 34.) The District sent the IEP and formal notice of placement of Joel at Shattuck Middle School, effective May 17, 2004, to the Parents on April 30, 2004. (*Id.* ¶¶ 42-43; *see also* Exs. 515-516.) On May 4, 2004, the Parents formally rejected the placement offer. (Ex. 518.) By letter dated May 6, 2004, the Parents stated that the IEP did not address their concerns, and asked the District to reconsider placing Joel at SSOS. The Parents stated that if the District was unwilling to modify the IEP to address their concerns, they would keep Joel at SSOS and seek reimbursement for the cost of his education there. (Ex. 517.) The District did not formally respond to this letter. On June 18, 2004, the Parents filed a request for a due process hearing to seek reimbursement for placing Joel at SSOS. (Decision ¶ 44.)

The due process hearing was originally scheduled for August 30, 2004, but the hearing dates were vacated at the request of the Parents so that they could seek review of the order of the ALJ denying the request of their out-of-state attorney, Stephen Walker, to represent them *pro hac vice* in the State proceedings. ALJ William Coleman of the Wisconsin Department of Hearings and Appeals entered an order denying Attorney Walker's request on July 21, 2004, on the ground that hearing officers appointed to conduct due process hearings under Wis. Stat. § 115.80 are not

5

authorized to permit non-resident attorneys who are not members of the Wisconsin Bar to engage in the practice of law in Wisconsin. However, ALJ Coleman noted that the denial of Attorney Walker's request would not prevent him from accompanying the parents to the hearing and advising them in the capacity of a person "with special knowledge or training with respect to the problems of children with disabilities," as permitted under Wis. Stat. § 115.80(3), 20 U.S.C. § 1415(h)(1), and 34 C.F.R. § 300.509(a)(1). It appears Attorney Walker did not seek further review of ALJ Coleman's ruling at that time, and the hearing was finally set for January 2005.

On January 11, 2005, a due process hearing commenced before ALJ Coleman, and after five days of testimony, was completed on February 25, 2005. Briefing was completed on April 8, 2005, and ALJ Coleman rendered his decision on May 6, 2005. He found that the IEP was "objectively reasonably calculated to provide [Joel] with a free appropriate public education in the least restrictive context" and that Joel did not require ESY services to receive a free appropriate public education. (Decision at 19-22; ¶¶ 45, 46.) ALJ Coleman also found, however, that the IEP team had not substantially developed the IEP, nor held the IEP meeting, before it decided to place Joel in the District's schools. (*Id.* at 16-19; ¶¶ 47-48.) He held that this denied the Parents meaningful participation in the IEP process. (*Id.*) ALJ Coleman also found that the District's failure to discuss three of the four goals, or any of the short-term objectives, in detail at the IEP meeting "denied the parents meaningful participation in development of this essential component of the IEP process." (*Id.* at 17.) He held that in light of the fact that the goals and objectives were drafted after the IEP meeting, the District should have offered to reconvene the IEP meeting to discuss them. (*Id.*)

ALJ Coleman held that the premature placement determination and the failure to discuss goals and objectives specifically at the IEP meeting or thereafter constituted procedural violations

6

of the IDEA that denied Joel a free and appropriate public education. (Decision at 17, 19, 22.) As a remedy for these violations, he ordered the District to reimburse the Parents $26,788.32, or 80% of the cost of annual tuition at SSOS of $33,485.40. ALJ Coleman reduced tuition reimbursement by 20% because he concluded that the Parents had not shown ESY services for the summer of 2004 to be necessary. He also found the evidence insufficient to establish that a residential placement at SSOS was necessary to give Joel a free and appropriate public education and therefore denied reimbursement of those expenses attributable to room and board.[2] (Decision at 22.)

## ANALYSIS

Whether the District has satisfied the requirements of the IDEA is a mixed question of law and fact. *Murphysboro v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir. 1994). On issues of law, the ALJ is entitled to no deference. *Dale M. ex rel. Alice M. v. Board of Educ.*, 237 F.3d 813, 817 (7th Cir. 2001). On issues of fact, however, the district court must accord "due weight" to the ALJ's decision. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). The party challenging the ALJ's factual findings bears the burden of proof. *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997). In deciding whether the challenging party meets that burden, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415 (i)(2)(B). "[W]here[, as here,] the district court does not take new evidence and relies solely on the administrative record, it owes

---

[2] Apparently Joel is attending a public school outside the Neenah Joint School District during the 2005-2006 school year (Parents' Resp. at 3), though no specificity is provided.

considerable deference to the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.' This level of review is akin to the standards of clear error or substantial evidence." *Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist. # 221*, 375 F.3d 603, 611-612 (7th Cir. 2004) (quoting *School Dist. v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002)).[3]

The IDEA requires the District, as a recipient of federal education funds, to provide children with disabilities a free appropriate public education (FAPE) in the least restrictive environment. 20 U.S.C. § 1412(1). A FAPE is an education that is "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Murphysboro*, 41 F.3d at 1166 (quoting *Rowley*, 458 U.S. at 189). The District is not required, however, to educate each handicapped child to his or her highest potential. *Id.*

The cornerstone of the IDEA is the development and implementation of the IEP. *Honig v. Doe*, 484 U.S. 305, 311 (1988). 20 U.S.C. § 1414(d)(1)(A)(i) sets forth the required components of an IEP, which include

(I) a statement of the child's present levels of academic achievement and functional performance, including–

(aa) how the child's disability affects the child's involvement and progress

---

[3] The Parents have moved to strike the District's motion for summary judgment or, in the alternative, to treat it as one for judgment on the administrative record. (Docket #26.) The District, by contrast, claims that it is the Parents' motion that is inappropriately titled. (Docket #29 at 2-3.) The court declines to join the argument over semantics. As the Seventh Circuit has explained, "the term 'summary judgment' in the context of an IDEA case has a different meaning than it has in a typical Rule 56 motion." *Alex R.*, 375 F.3d at 611. Under the IDEA, "[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S.*, 125 F.3d at 1052 (quoting *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir.1994), *cert. denied*, 513 U.S. 839 (1994)). That being said, the court will deny the parents' motion to strike.

8

> > in the general education curriculum;
>
> > . . .
>
> > (cc) for children with disabilities who take alternate assessments aligned to alternate achievement standards, a description of benchmarks or short-term objectives;
>
> > (II) a statement of measurable annual goals, including academic and functional goals, designed to–
>
> > > (aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and
> >
> > > (bb) meet each of the child's other educational needs that result from the child's disability;
>
> > (III) a description of how the child's progress toward meeting the annual goals described in subclause (II) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided.
>
> > . . .

*See also* 34 C.F.R. § § 300.347. Parents have the right to be members of "any group that makes decisions on the educational placement of their child," 20 U.S.C. § 1414(f), including the team that produces the IEP. 20 U.S.C. § 1414(d)(1)(B). School districts are responsible for ensuring that parents are afforded an opportunity to participate at each IEP meeting. 34 C.F.R. § 300.345(a).

In evaluating an IEP under the IDEA, the court must consider whether "(1) the school district followed the IDEA's procedures and (2) the IEP is reasonably calculated to enable the child to receive educational benefits [i.e., to receive a free and appropriate public education]." *Alex R.*, 375 F.3d at 613. When a district produces a substantively flawed IEP–that is, an IEP that does not enable the student to receive a free and appropriate public education–the district has violated the

IDEA and the student and his parents are entitled to relief, which may include the costs of an appropriate private placement. *Florence County Sch. Dist. Four v. Carter by and through Carter*, 510 U.S. 7, 15 (1993). Generally, procedural flaws only entitle the parents to relief when they result in the loss of educational opportunity. *Heather S.*, 125 F.3d at 1059.

As an initial matter, the District challenges ALJ Coleman's holding that any procedural violations of the IDEA that infringed the Parents' opportunity to participate in the IEP formulation process resulted in the denial of a free and appropriate public education to Joel. In *Heather S.*, the Seventh Circuit approvingly cited the Ninth Circuit's holding in *W.G. v. Bd. of Trustees*, 960 F.2d 1479 (9th Cir. 1992), that

> [p]rocedural flaws do not automatically require a finding of a denial of a [free and appropriate public education]. However, procedural inadequacies that result in the loss of educational opportunity . . . clearly result in the denial of a [free and appropriate public education].

*Id.* at 1484. In the omitted portion of the quotation, the Ninth Circuit went on to say that procedural inadequacies that "seriously infringe the parents' opportunity to participate in the IEP formulation process" also result in the denial of a free and appropriate public education. *Id.* The District correctly points out that the Seventh Circuit has never explicitly adopted this language from *W.G.* In fact, in *Evanston Community Consol. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 804 (7th Cir. 2004), the Court declined the parents' request that it "adopt the rest of the W.G. language," finding instead that "[t]he record does not support a finding that the parents' rights were in any meaningful way infringed." *Id.* Thus, at the time the ALJ issued his decision, it was an open question in this Circuit whether a procedural violation that seriously infringes the parents'

10

opportunity to participate in the IEP formulation process constitutes the denial of a FAPE, even if the court can otherwise conclude that the resulting IEP is appropriate.[4]

The proposition that serious infringement of parents' opportunity to participate in the IEP formulation process can amount to a denial of a free and appropriate public education is well-supported, however, by case law from other circuits, *see, e.g., Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990); *Hall by Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir. 1985), and by regulations adopted by the Department of Education. *See* 20 U.S.C. § 1415(f)(3)(E)(ii) ("In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies . . . significantly impeded the parents' opportunity to participate in the decisionmaking process . . . ."). Supreme Court precedent also provides implicit support. *See Rowley*, 458 U.S. at 205-206 ("It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard."). In light of this authority and given Congress' recent amendments of IDEA, this court does not question the ALJ's conclusion that procedural inadequacies that seriously infringe the parents' opportunity to participate in the IEP formulation process can result in the denial of a free and appropriate public education to the child.

---

[4]Effective July 1, 2005, Congress amended the IDEA to specifically provide that a hearing officer may find that child did not receive a FAPE on the basis of a procedural violation if the violation "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child." 20 U.S.C. § 1415(f)(3)(E)(ii)(II).

11

The question, however, is whether such inadequacies are present in this case. ALJ Coleman found that they were in two respects–first, the District's arguably premature determination of Joel's placement, and second, the District's failure to reconvene the IEP team after it formulated the goals and objectives outside the presence of the Parents. With respect to the former supposed inadequacy, the court cannot reconcile ALJ Coleman's ruling with his other findings and with the requirements of the IDEA. The IDEA required the District to mainstream Joel to the maximum extent appropriate:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). Pursuant to this provision, the District "must ensure that '[Joel] is educated in the school that he . . . would attend if nondisabled' unless [Joel's] educational program 'requires some other arrangement.'" *Casey K. ex rel. Norman K. v. St. Anne Community High School Dist. No. 302*, 400 F.3d 508, 512 (7th Cir. 2005) (quoting 34 C.F.R. § 300.552). In other words, the District had no obligation to consider placing Joel at SSOS unless and until it concluded that he could not receive a free and appropriate public education in district schools. *See* 20 U.S.C. § 1412(a)(10)(C)(i) ("[T]his subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility."); *Jenkins v. Squillacote*, 935 F.2d 303, 305 (D.C. Cir. 1991) ("[I]f there is an appropriate public school program

12

available, i.e., one reasonably calculated to enable the child to receive educational benefits, the District need not consider private placement, even though a private school might be more appropriate or better able to serve the child . . . . In short, the inquiry as to the appropriateness of the State's program is not comparative.") (internal quotation marks and citations omitted). The District determined, and the ALJ found, that Joel could receive a free and appropriate public education in district schools. (Decision at 22.) Having so concluded, the District was entitled to draft an IEP that assumed Joel would be educated in the District's schools, and was not required to consider placement at SSOS. *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 54 (1st Cir. 1992) (holding that determining placement before drafting of IEP did not violate IDEA).

ALJ Coleman also faulted the District because discussion of goals and short-term objectives at the IEP meeting never got beyond "general terms," with one exception (Joel's hand-raising techniques). (Decision ¶ 24.) ALJ Coleman found that "no specific short term objectives were identified at the IEP meeting, though the extended discussion and the information before the team provided information from which to develop appropriate short term objectives." (Decision ¶ 25.) Because there was little discussion of specific goals or short-term objectives at the IEP meeting, "the drafters of the IEP were left to devise their own, without the input of the other members of the IEP team, including, most significantly, the Parents."[5] (Decision at 17.) ALJ Coleman held that the District should have reconvened the IEP team for the purpose of discussing the goals and short-term objectives when it tendered the IEP and formal offer of placement to the Parents. (*Id.*)

---

[5]ALJ Coleman found that "[t]he conclusion is inescapable that the drafters of the IEP, knowing that the placement determination was for a small group setting in the District schools, endeavored to craft goals and short term objectives that fit this placement determination." (Decision at 17.) However, he also determined that the goals and short-term objectives were "objectively reasonable." (*Id.i at 20.*)

13

But it is one thing to say that the District should have reconvened the IEP team to further discuss goals and short-term objectives; it is quite another to say that the Parents were denied an opportunity to participate in the process of formulating the IEP to such an extent that Joel was denied a FAPE. The record in this case, which includes a recording of all but the last fifteen minutes of the IEP meeting, demonstrates that the District did not deny the Parents an opportunity to participate in the IEP process. On several occasions in the course of the two-and-a-half hour meeting, members of the team attempted to focus on the task of setting specific goals and objectives. Joel's mother, along with her attorney, was part of that process and was specifically asked for her input. Rather than suggest goals and short-term objectives she wanted included in the IEP, Joel's mother made clear to the team that she did not believe the District could provide her son an appropriate education. In her view, "the issue on the table [was whether the District would] pay for him to be at Sonia Shankman where he needs to be . . . ." (Ex. C, Disc #2, Track 5.) Despite her view that the District was unable to meet her son's needs, the team continued to discuss the efforts it was willing to undertake in order to provide Joel an appropriate education. They offered to revisit the IEP once the anticipated evaluation from SSOS was received or if problems surfaced in the course of the year. They also offered to meet with the Parents to discuss any changes they thought appropriate. Moreover, upon receipt of the completed IEP, Joel's mother did not complain that the goals and short-term objectives had not been adequately discussed or request additional ones be added. Her cryptic letter simply stated that "the IEP you proposed does not address the concerns we have repeatedly raised." (Ex. 517) She asked the District to reconsider placement at SSOS and stated that if the District was unwilling to modify the IEP and address "the concerns we have previously raised," she would look elsewhere, including SSOS for placement for her son. (*Id.*)

14

In the face of this record, the court cannot accept the ALJ's finding that the District seriously infringed the Parents' opportunity to participate in the IEP formulation process.[6] None of the cases cited by the Parents support their contention that a failure to complete the IEP at the meeting constitutes a denial of procedural rights of such a magnitude that reimbursement for private school placement is required, even where the IEP that was proposed is found to be appropriate. "It is permissible for one person to draft the IEP as long as the parents are not denied the opportunity to participate, and the members of the IEP team have an opportunity to discuss and amend the IEP." *Hampton School Dist. v. Dombrowolski*, 976 F.2d 48, 54 (1st Cir. 1992). While procedural violations that seriously impair the parents' opportunity to participate in the formulation of the IEP may result in the denial of a free and appropriate public education, no such violation occurred here.

The Parents' remaining procedural challenges to the IEP fare no better. The Parents contend, for example, that the District violated the IDEA by failing to invite Joel's present teacher and other personnel from SSOS to the IEP meeting so that an accurate determination could be made as to Joel's present level of educational performance. As a result, they claim that the IEP is deficient in that it does not reflect Joel's present level of performance in relation to the annual goals and objectives. But as the ALJ pointed out, a school district is required to insure that a representative of a private school attends the IEP meeting only if the school district placed the child in the private school. 34 C.F.R. § 300.349. "There is no corresponding requirement that a school district insure the attendance or participation of a representative of a private school in which a

---

[6]In truth, because the underlying facts are essentially undisputed, the ALJ's assertion that the District denied the parents their right to meaningful participation in the development of the IEP is a conclusion of law, rather than a finding of fact to which this court would owe substantial deference. "On issues of law, the hearing officer is entitled to no deference." *Alex R. v. Forestville Valley Community Unit School Dist.*, 375 F.3d 603, 611 (7th Cir. 2004).

*parent* has unilaterally placed a child with a disability." (Decision at 14.) (emphasis original). In any event, the record reflects that the District made every effort to insure input from SSOS. It sent three representatives to SSOS to meet with staff and observe Joel. It offered the Parents alternative meeting dates in an effort to allow the Parents to invite SSOS to attend or participate by telephone. Team members also repeatedly spoke of their interest in SSOS's evaluation and report, which they hoped to have available by the time of the hearing. The District cannot be faulted for failing to secure additional input from SSOS. And while updated information from SSOS may have been helpful in assessing Joel's present level of educational performance, the ALJ concluded that the absence of such information "would not lead to the denial of a free appropriate public education." (Decision at 20.)

The Parents also claim that the formal notice of placement prepared by the District was legally deficient in that it failed to explain why the District was proposing a placement in the Neenah School District and what other options it had considered. A State statute and a federal regulation require that the notice provided to the parents state such information. Wis. Stat. § 115.792(2); 34 C.F.R. § 300.503. The District argues that when considered with the IEP which accompanied the notice, the Parents were provided the required information. The court agrees. The ALJ correctly concluded that this was at most a technical violation that did not affect the substantive rights of the Parents.

Lastly, the Parents claim that the ALJ erred in denying the request of their out-of-state attorney to represent them *pro hac vice* pursuant to Supreme Court Rule (SCR) 10.03(4). As noted above, ALJ Coleman denied Attorney Walker's request on the ground that a hearing officer lacks the authority under SCR 10.03(4) to permit an out-of-state attorney who is not a member of the Bar

16

to practice law in the State. In support of his decision denying Attorney Walker's request, the ALJ cited *Seitzinger v. Community Health Network*, 2004 WI 28, 676 N.W.2d 426 (Wis.), in which the Wisconsin Supreme Court affirmed the circuit court's decision denying the request of an attorney not licensed in the State of Wisconsin to represent his physician client at a hospital peer review hearing to review the revocation of his staff privileges. *Seitzinger* is not altogether persuasive, however, since it rested on the construction of the hospital's by-laws that were at issue in that case and, in addition, a presiding officer in a hospital peer review hearing over revocation of a physician's staff privileges bears little resemblance to an ALJ presiding over a statutory due process hearing under Wis. Stat. § 115.80. Given the broad definition of the term "judge" in SCR 60.01(8) ("anyone, whether or not a lawyer, who is an officer of a judicial system and who performs judicial functions"), the Parents' argument that ALJ Coleman erred in concluding he lacked such authority is not without merit. But the court finds it unnecessary to resolve this uncertain issue of state law. Attorney Walker did appear with the Parents at the due process hearing and functioned as their attorney in all but name. The only effect of the ALJ's ruling denying his request to represent the Parents *pro hac vice* is that it meant they could not recover attorneys fees for his services if they prevailed. But since under this court's analysis they do not prevail in any event, the issue is moot. Accordingly, the court need not decide this issue.

## CONCLUSION

In conclusion, the Parents' motion to strike the District's motion for summary judgment is denied. The court grants the District's motion and reverses that portion of the ALJ's decision finding that the District seriously infringed the Parents' opportunity to participate in the formulation

17

of the IEP for their son and thereby denied him a free and appropriate public education.  In all other respects, the findings and conclusions of the ALJ are affirmed.  It follows that the Parents' request that the District be ordered to reimburse them for the costs of private school tuition and related expenses at SSOS must be denied and the action dismissed.  The clerk is directed to enter judgment in favor of the District in accordance with this decision.

**SO ORDERED.**

Dated this   27th   day of June, 2006.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
